Our next case is Rachel Creager Ireland et al. United States, 2023-1163. Ms. Schwartz, we're ready when you are. Yes, thank you, sir. Thank you, Your Honor, and may it please the Court. In the early days of the COVID-19 pandemic, Congress enacted a statute creating pandemic unemployment assistance. Section 9021B of those provisions states that the Secretary of Labor shall provide to any covered individual unemployment benefit assistance. That language is mandatory and unconditional, and this Court should enforce it. Importantly, this language is unique amongst the unemployment compensation programs included in the CARES Act. In no other program did Congress include anything like Section 9021B. Counsel, your problem is Section F, which says the Secretary shall provide the assistance through agreements with states. To be precise, Your Honor, it says with agreements through agreements with states which, in the judgment of the Secretary, have adequate systems for delivering those benefits. It does not say that the only way to administer benefits to a covered individual is through an agreement with that individual state. To the contrary, subsection F contemplates that some states would not be capable of administering benefits, and nothing in the statute says that individuals living in such states would not receive those benefits. In fact, the statute contemplates the possibility of cross-state administration. How does it work in the circumstance of DUA, the other one? I'm referring to this as PUA. How does it work in that context? Because it does seem as if this statute was modeled after the DUA statute. My understanding is that in disaster unemployment assistance, which, of course, is based for regional disasters, it's primarily delivered through agreements with the state. What if a particular state does not have an agreement? If a particular state does not have an agreement, my understanding is, in that scenario, the benefits, which are, of course, discretionary in that statute, would not be delivered. But there is the precedent from Hurricane Katrina when disaster unemployment assistance benefits were administered by other states. But those other states have to stand up and say, yes, I will administer this, right? Oh, of course. And in this scenario, we believe that there are parts of the pandemic unemployment assistance statute that would make that even more appealing here than it was in Katrina, where, of course, states did stand up and do that. In this statute, not only the entire amount of the benefits was funded by the federal government, but so were all of the administration costs. Now, Ms. Schwartz, what provision of the PUA provides for direct payment by the government to individuals? Well, Section 902 of these states that the Secretary of Labor shall provide to any covered individual unemployment benefit assistance. But that doesn't say that the government will provide a direct payment to individuals. In fact, Section B says exactly the opposite, that it will be provided through agreements with the states. Well, under the Tucker Act, the question is whether the statute can be fairly interpreted as requiring the payment to the individual, not what route the payments ultimately have to take to get there. If the question were what the claimant does not have to show that the secretary was charged with direct payment. But isn't the problem here, it's a slightly different than what you're saying. It's a little nuanced to say this, that Sections F and B have to be read together. And together, they show that the payments that the secretary shall provide are going to be paid in a certain way. Correct. But that way, well, first of all, we have the Subsection B, which states that it's the secretary that's charged with providing them to the individuals. We think that is especially notable given the surrounding provisions creating the other unemployment compensation programs, which were clear that the access to those benefits was conditioned on a state's desire to participate. But Subsection F, again, does not say that the only way to provide the benefits is through an agreement with an individual state. It says through agreements with states, which in the judgment of the secretary, have an adequate system for administering those benefits. It does say shall there. There is a shall in Part F, right? Correct. Yeah. I don't think anyone's argued that it's not a mandate to provide, to use agreements with states which have the inadequate system for doing so. But nothing about that language defeats the secretary's obligation, as outlined in Subsection B, to provide unemployment benefit assistance to all covered individuals. And again, I would emphasize the point that this is confirmed by critical differences with the other provisions creating the other unemployment compensation programs, which appear in this exact same title in the same, enacted as part of the same organic statute. When Congress wanted to limit these benefits to only those states that wanted to participate in the program, it did so expressly. It did so in the provisions creating those those other programs. Another critical difference I would like to point out is the uniform nationwide eligibility criteria that appear in the pandemic unemployment assistance provisions, but do not appear in any of the provisions creating the other unemployment compensation programs. Which, again, we think is important as it shows that Congress did not mean to defer to the states to determine whether their residents would have access to these to these benefits. And I want to emphasize that this deliberate decision by Congress to deliberately differentiate pandemic unemployment assistance from the other programs coheres with the unique structure, the unique design and purpose of pandemic unemployment assistance. Whereas these other unemployment compensation programs in the CARES Act were designed to enhance existing benefits available under states' unemployment compensation programs, pandemic unemployment assistance was designed to circumvent states' judgments as to who should receive these benefits. In the context of an, excuse me, of an unprecedented nationwide unemployment crisis, Congress wanted to ensure that everybody who needed it, everybody who was unemployed due to COVID-19 would receive these benefits. Those other programs that you're referring to specifically, they would be the funds provided to the states and then whatever the qualifications that states could put on whatever qualifications they wanted to on how those funds were disbursed. Well, I think to be precise that it was the existing eligibility criteria in states' unemployment compensation programs that always apply. And that would exclude a lot of people. So independent contractors, small business owners, people who did not have a sufficient amount of income. So this program was set up so that, well, by taking away those requirements, the money that went to the state would be distributed just based on not the same criteria, not the state's criteria, but on for anybody. Well, it would be distributed based on the criteria in subsection A of the pandemic unemployment assistance provisions, which generally provide that they apply to, shall be delivered to anybody who was unemployed due to COVID-19. And it lays out all the reasons that that might happen and that who and those who were ineligible for unemployment compensation under their state, which might be for these people that I just enumerated or could be people who had exhausted their benefits under state law. Failing to point to a limitation in the text on the mandatory language of subsection B, the government spends a lot of time on what it terms practicability concerns. We want to emphasize that this at most has marginal relevance to the statutory interpretation question. We have pointed to the availability of cross-state administration in order to make a point about the interpretation of the statute. The district court rested its conclusion on the idea that the statute provided no other means or contemplated no other means of delivering benefits. But that's simply not true. Cross-state administration was contemplated. But in any event, the government's practicability concerns are wrong on their own terms. Their argument relies primarily on the idea that staff of state unemployment compensation agencies are incapable of reading other states statutes. But I just don't think that's a tenable position, given that these are, of course, the same individuals charged with interpreting and applying the Pandemic Unemployment or the CARES Act unemployment programs, as well as existing rather detailed federal regulatory requirements. For that cross-state administration, how does that work? I mean, that didn't happen here, right? But wouldn't you have to have a state that stood up and said, hey, we're going to be your cross-state administrator? That didn't happen. So, I mean, even if that was a viable option, because it didn't happen, I'm not sure if I'm following your argument. Well, the fact that the government did not call through on its obligation, we don't think absolves it of its duty to provide these payments under subsection B. You're saying that the federal government would have had to effectuate that? Correct. Well, I think that also squares with the Texas subsection F, which states that it's the federal government, that the secretary shall enter into these agreements and that it should do so. I also want to emphasize that under the Tucker Act, a claimant is not required to show how the payments could have been administered at the time they became owing. I think if that were the case, Maine community would have come out the other way. I don't think there's any question in that case. The Secretary of Health and Human Services could not have made those payments. The question is limited to the question, as the court put it in Maine community, whether the statute can be fairly interpreted as requiring payment to the claimant. And I think that's quite clear from the text of subsection B. Your argument is that section B requires the government to make a direct payment to individuals. The argument is that subsection B gives claimants a right to the payments under the statute. But section F forecloses the government from making payments anyway, other than through states. It says the state shall provide this assistance through agreements with states. Correct. How would the government make a direct payment without violating section F?  First is that, of course, subsection F, again, does not state that it has to be the state of the covered individual. So, again, cross-state administration was a possibility. Right, but that's not my question. So I don't think it would violate the statute because of the discretionary language in subsection F, stating that the Secretary has discretion to determine whether a state has an adequate system. Once a state no longer has an adequate system, it no longer has to enter into an agreement with that state. So the government would then, on your theory, would have to make inquiry of every state as to whether they are prepared to enter into these agreements or not. And if they find a state where the state is not prepared to enter into this agreement or not capable, then the government could make payments through that state to anybody they wanted? I'm just trying to work my way through this language. No, of course. Well, I think subsection F does require the government to make an inquiry, correct, whether the state has an adequate system at all. And in the event that the state does not have an adequate system, the statute contemplates that a state that does have an adequate system would administer those benefits, and we don't think there's anything that prohibited direct federal administration. Of course, the American Rescue Plan Act provided appropriations that could have been used for direct federal administration. And so, you know, we think there are a few options available to the Secretary, and so that there was simply no basis in the statute for finding an implicit limitation on subsection B, limiting the availability of those benefits to individuals whose own state had entered into an agreement. I know I'm into my rebuttal time, and if there are no further questions, I'd like to reserve the remainder of my time. Since you're answering a question, we'll give you your three minutes. Thank you. Mr. Myers. Good morning, Your Honors. Stephen Myers from the Justice Department on behalf of the United States. Plaintiff's Little Tucker Act claim fails on the merits because Congress was clear in Section 9021 that the payment of benefits was conditioned on the existence of a state agreement, and it incorporated regulations under the Stafford Act making clear that payments could not be paid in any other way. The statute does not require or indeed even permit direct federal administration of the program, so this Court should affirm the judgment of the District Court. I'll start by talking about subsection F. The language is clear as day. Again, the Secretary is to provide the assistance that's authorized under B through agreements with states. That's F1. F2 then goes on to explain that there shall be paid to each state which has entered into an agreement the funds that are necessary to administer and operate the program. And so if Congress wanted to enact a statute that contemplated direct federal administration, it could have done so. Indeed, we've pointed to examples where Congress has done exactly that in the Trade Adjustment Assistance Program, the Unemployment Compensation Programs for federal employees and ex-servicemen. Congress didn't do so here. Instead, what Congress did is it modeled the program on the Disaster Unemployment Assistance Program under the Stafford Act, and it specifically incorporated regulations under that statute that, again, are explicit, that benefits are payable only by states and only when an agreement is in effect. Congress obviously knew about those regulations. It incorporated them expressly. And if Congress didn't want them to apply, it's reasonable to assume that Congress would have said so. That's 625, right? 625.12b1, yes, Your Honor. So that's subsection F. That's subsection H. Subsection G is the appropriation, which is what authorizes the making of payments under the Appropriations Clause. And again, that is an appropriation to make payments to states. So the statute is just clear over and over and over again that this is how Congress expected the program to work. Under subsection A, you have to provide initial documentation to a state. Under subsection C, you need to continue providing week by week a recertification of your eligibility to a state. I think it's worth observing that even if the court weren't persuaded by everything I've been saying so far, plaintiffs still don't allege that they actually complied with that requirement. That's at C6 of the statute. So even if plaintiffs were correct that either Texas couldn't have withdrawn or that the federal government was required to engage another state to administer the program on Texas' behalf, there would still be this requirement under C6 to keep submitting a certification of eligibility. And plaintiffs don't allege that they did that. With respect to subsection B, Judge Stoll, I think Your Honor gets it exactly right, which is that the Supreme Court has said that we need to read statutes as a whole. We don't take provisions in isolation. And what subsection B is really doing is it's distinguishing this program in certain limited respects from the Stafford Act. So under the Stafford Act, the president has discretion to declare or not declare a natural disaster. That's why it says that the president is authorized to make these payments. Under subsection B, it was Congress that decided that COVID was a national emergency that required a program like this. And so Congress made that determination. So the president lacks that aspect of discretion. That's what shall means in B. But nevertheless, the shall in B needs to be read in harmony with the shall in F, which again says that this program is run by states. Payments are made to states. With respect to the possibility of cross-state administration, there are a few points I just want to very briefly highlight. The first is that there is no threshold obligation on the secretary to go out and find a state where Texas or another state decides it doesn't want to participate. And indeed, in a case like this, where 20 states ultimately withdrew, it would be a massive burden to impose on the secretary to somehow persuade the other 30 states to do this. And the statute simply doesn't say that. And if that's wrong, there'd be no incentive on any state to actually participate in this program because every state would know that the secretary would either do it for them or the United States would wind up on the hook under the judgment fund. And that's not the statute that Congress wrote. And finally, even if that's wrong, even if the United States did breach an obligation, which it didn't, to go find another state, that still wouldn't require direct payments to the plaintiffs. It would mean that the United States, under plaintiff's theory, breached an obligation to take some agency action. That's an APA claim, not a Little Tucker Act claim. I'm happy to answer any questions that the court has or otherwise, just to ask for an affirmation. Thank you very much, Your Honor. Thank you. Ms. Schwartz, you have three minutes if you need it. Thank you, Your Honor. I just want to address a few points. The first is subsection H. I think the best way to understand how the disaster unemployment assistance regulations apply is the language of subsection H itself, which said that those regulations apply except as otherwise provided under the pandemic unemployment assistance statute or to the extent they conflict. The pandemic unemployment assistance statute has its own comprehensive eligibility criteria. The single subsection that the government relies on relates to eligibility. And so there's simply no need to look to these regulations. And to the extent that they do conflict by restricting access to the program beyond what the pandemic unemployment assistance statute provides, that's a conflict and the regulation simply doesn't apply. The government points to the disaster unemployment assistance statute as perhaps a model for pandemic unemployment assistance. But, of course, the Congress departed in a significant way from the disaster unemployment assistance statute by creating a mandatory, by obligating the secretary to provide benefits to individuals rather than creating a discretionary program. The government says that there is no requirement to figure out how to make these payments. But, of course, subsection B is a requirement for the secretary to pay unemployment benefits assistance to covered individuals. And, you know, I really want to emphasize that I think the practicability concerns are these sort of speculations are a red herring. When it comes to the question under the Tucker Act and the statutory interpretation question is whether there was an implicit limit on subsection B. And there's just nothing in the statute that says that. And that is especially notable given the language of the other unemployment compensation programs enacted in the same title of the same organic statute, which were explicit about limiting access to those programs based on a state's desire to participate. Language which is deliberately omitted from the pandemic unemployment assistance provisions. And just to conclude, you know, in the pandemic and employment assistance provisions, Congress made a promise to everybody unemployed due to COVID-19 that they would receive these benefits for the entire duration of the program. Congress, the federal government violated that promise. And the Tucker Act is designed to remedy exactly those types of violations. And for this reason, we ask the court to reverse and remand. Thank you. Thank you, counsel. Case submitted and that concludes today's argument.